**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMIE RICHARDSON, individually and on behalf of all similarly situated,** | ) ) ) | **MDL No. 2492** |
| | ) | **Master Docket No. 16 C 8787** |
| **Plaintiff,** | ) ) | **Original N.D. Ill. Docket No.** |
| **v.** | ) ) | **16 C 9980** |
| **SOUTHEASTERN CONFERENCE and THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,** | ) ) ) ) | **Judge John Z. Lee** |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jamie Richardson has filed this action individually and on behalf of a putative class of similarly situated student-athletes, who played football for the University of Florida ("UF"). He has sued the National Collegiate Athletic Association ("NCAA") and the Southeastern Conference ("SEC")—the athletic conference in which UF plays—based upon theories of negligence, fraudulent concealment, breach of express and implied contract, breach of express contract as a third-party beneficiary, and unjust enrichment, all arising out of Defendants' alleged failure to adopt and implement adequate concussion treatment, concussion management safety protocols, and return-to-play guidelines.

The SEC has moved to dismiss the complaint for lack of personal jurisdiction under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). The NCAA has moved to partially dismiss the complaint pursuant to Rules 9(b) and 12(b)(6). For the reasons provided herein, the SEC's Rule 12(b)(2) motion is granted, and the NCAA's Rule 12(b)(6) motion is granted in part and denied in part.

**Factual Background**[1]

I.      **Richardson at UF**

The University of Florida maintains one of the most prominent and successful college football teams in the country.   Compl. ¶ 18, ECF No. 1.  Every year, UF football generates tens of millions of dollars in annual revenue for the school.  *Id.*

Richardson played as a wide receiver for the UF football team from 1994 to 1996 and, in that role, he sustained repetitive concussive and subconcussive hits during practices and games. *Id.* ¶¶ 78, 81.  Richardson alleges that, during this time, the NCAA and the SEC failed to put in place adequate concussion treatment, concussion management safety protocols, and return-to-play guidelines.  As a result, Richardson would be quickly put back into games and practices despite his injuries.  *Id.* ¶¶ 80–83.  Moreover, he asserts that the SEC and the NCAA knew at the time that such treatment, protocols, and guidelines were necessary to monitor, manage, and mitigate the risks associated with traumatic brain injury.  *Id.* ¶ 83.  As a result, Richardson now suffers from severe daily headaches, memory loss, dizziness, and other debilitating symptoms.  *Id.* ¶ 84.

II.     **Defendants' Roles in Safeguarding Richardson's Health**

The NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including UF football players.   *Id.* ¶ 15.  To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different divisions of intercollegiate competition.  *Id.* ¶ 16.  Each NCAA division is composed of several conferences, such as the SEC, to facilitate regional league play. *Id.* ¶ 17.

---

[1]      On a motion to dismiss, the district court accepts all facts pleaded as true and draws all reasonable inferences in the plaintiff's favor.  *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019).

The NCAA's predecessor, the Intercollegiate Athletic Association of the United States, was specifically formed at the turn of the twentieth century in order to make college football safer for student-athletes, who were experiencing head injuries at an alarming rate. *Id.* ¶ 20. Similarly, the singular goal of the NCAA was and is student-athlete safety. *Id.*

The SEC consists of fourteen member institutions located in Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, South Carolina, Tennessee, and Texas.[2] *Id.* ¶ 17. One of the winningest athletic conferences in NCAA history, the SEC also is one of the most financially successful. *Id.* For example, the SEC distributed approximately $455 million to its member schools in 2015 alone. *Id.* Together, the NCAA and the SEC regulate the UF football program and owe a duty of care to safeguard the well-being of its student-athletes. *Id.* ¶¶ 19, 32.

The NCAA and the SEC are governed by the NCAA Constitution, which states that their primary principle is to ensure that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes." *Id.* ¶¶ 24, 32. To accomplish this purpose, the NCAA has promulgated and implemented certain regulations and requirements for its sports, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which provide detailed instructions on game and practice rules pertaining to player well-being and safety. *Id.* ¶ 25.

The NCAA also publishes a Sports Medicine Handbook ("Handbook"), which it updates every year. *Id.* ¶ 26. The Handbook includes official policies for the treatment and prevention of

---

[2] The SEC's fourteen member institutions are: Auburn University, Louisiana State University, Mississippi State University, Texas A&M University, University of Alabama, University of Arkansas, University of Florida, University of Georgia, University of Kentucky, University of Mississippi, University of Missouri, University of South Carolina, University of Tennessee, and Vanderbilt University. SEC's Mem. Supp. Mot. Dismiss, Ex. 1, Womack Decl. ("Womack Decl."), ECF No. 23-1.

sport-related injuries, as well as return-to-play guidelines. *Id.* These policies recognize that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation." *Id.* As an NCAA member conference, the SEC is required to enforce all applicable NCAA policies to protect the health and safety of UF football players, such as Richardson. *Id.* ¶¶ 30, 32. In addition, member institutions such as UF also are required to comply with all applicable NCAA rules and regulations. *Id.* ¶ 31. Moreover, the NCAA Constitution states that the NCAA "shall assist [each] institution in its efforts to achieve full compliance with all rules and regulations." *Id.* ¶ 27.

As compared to Richardson and other UF football players, the NCAA and the SEC were in a superior position to know of and mitigate the risks of concussions. *Id.* ¶ 33. And UF football players relied on the NCAA and the SEC to protect their health and safety by preventing and treating head-related injuries. *Id.* ¶ 100.

## III. Concussions and Concussion-related Symptoms

A concussion results from an impact that causes the head and brain to move rapidly back and forth. *Id.* ¶ 35. During normal everyday activity, spinal fluid protects the brain from touching the skull. *Id.* ¶ 36. But relatively minor impacts, including direct impacts to the head and impacts to the body that cause the neck to whiplash, can cause the brain to press through the fluid and touch the skull. *Id.*

Studies have shown that collegiate football players, during the course of a season, can receive more than 1,000 impacts greater than 10G's.[3] *Id.* ¶ 37. And the majority of football-related hits to the head exceed 20G's. *Id.*

---

[3]     "G" is an abbreviation for "G-force," the force of gravity or acceleration on a body. *See* https://www.merriam-webster.com/dictionary/g-force.

When a football player suffers a severe impact that affects the head, he or she may experience a variety of symptoms, including: (1) seeing stars, dizziness or lightheadedness; (2) memory loss; (3) nausea; (4) vomiting; (5) headaches; (6) blurred vision or light sensitivity; (7) slurred speech; (8) difficulty concentrating or decision-making; (9) difficulty with coordination or balance; (10) unexplained anxiety or irritability; and/or (11) excessive fatigue. *Id.* ¶ 39. Concussed people may not recognize the signs of a concussion, and the symptoms may prevent them from realizing they have suffered a concussion. *Id.* ¶ 40.

After a concussion, the brain needs time to heal to prevent further injury. *Id.* ¶ 41. Concussion symptoms may continue for two weeks. *Id.* ¶ 42. Doctors generally prohibit concussed patients from returning to normal activities until all symptoms have subsided. *Id.* ¶ 41. Individuals who continue to experience concussion symptoms after a few weeks are diagnosed with post-concussion syndrome. *Id.* ¶ 43. Many people think of concussions as short-term injuries, but scientific research demonstrates that concussions can have long-lasting effects. *Id.* ¶ 44.

## IV. Long-term Effects of Concussions and Subconcussive Impacts

The complaint cites numerous studies that discuss the risks associated with brain trauma. *Id.* ¶¶ 45–60. For example, studies of brain injuries suffered by boxers date back to the 1920s. *Id.* ¶ 49. In a study published in 1928, Dr. Harrison Martland described the abnormalities found in nearly half of the boxers who had either been knocked out or who had suffered a considerable impact to the head. *Id.* ¶ 50. Other studies of boxers revealed that repetitive head injuries caused chronic neurological damage and a pattern of progressive decline in the form of dementia and motor function impairment. *Id.* ¶ 51.

The American Football Coaches Association published a report in the 1930s warning that players who suffered concussions should be removed from play. *Id.* ¶ 52. A 1952 article published in *The New England Journal of Medicine* recommended a three-strike rule for concussions in football that would prohibit players from playing football after three concussions. *Id.* In a 1969 study, Drs. J.R. Hughes and D.E. Hendrix used electroencephalograms ("EEGs") to examine the impact of severe hits on brain activity. *Id.* ¶ 53. Shortly thereafter, doctors identified a potentially fatal condition known as "Second Impact Syndrome," referring to a skull of an already-concussed brain that cannot accommodate another impact injury. *Id.*

More recently, Boston University's Chronic Traumatic Encephalopathy Center and the Brain Injury Research Institute conducted two well-regarded studies describing the long-term effects caused by concussions. *Id.* ¶ 45. These studies demonstrated that repeated concussions triggered progressive degeneration of brain tissue, including the build-up of an abnormal protein called "tau." *Id.* The studies also showed that repeated concussions resulted in an increased risk of depression, dementia, and suicide. *Id.*

In yet another example, Dr. Robert Cantu of Boston University's Chronic Traumatic Encephalopathy Center studied autopsies performed on the brains of former National Football League players, concluding that 96% of the samples shows signs of chronic traumatic encephalopathy ("CTE"). *Id.* ¶ 47. Dr. Cantu also reviewed analyses of brains of individuals who played football at any level and found that 79% exhibited indications of CTE. *Id.*

According to Richardson, study after study published in established medical journals, including the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*, warned of the dangers arising from single and multiple concussions. *Id.* ¶ 54. These studies established that:

- even minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials, and reduced speed of information processing;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the brain tissue;

- immediate retrograde memory issues occur following concussions;

- repetitive head trauma has potential dangerous long-term effects on brain function, including causing encephalopathy;

- a football player who suffers a concussion requires significant rest before being subjected to further contact to avoid risk of further injury; and

- there is a relationship between neurologic pathology and length of the athlete's career in contact sports.

*Id.*

As a result of these studies, medical professionals began recommending changes to football and how concussion-related injuries should be handled. *Id.* ¶ 55. By 1991, Dr. Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained traumatic brain injuries. *Id.* ¶ 56.

In fact, the NCAA began conducting its own concussion-related studies in 2003. *Id.* ¶ 57. One of these studies concluded that football players, who had previously sustained a concussion, were more likely to have future concussion-related injuries. *Id.* Another NCAA study found that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks." *Id.*

Along these same lines, in 2004, the National Athletic Trainers' Association issued a position statement recommending baseline cognitive and postural-stability testing, as well as return-to-play guidelines prohibiting athletes who exhibit symptoms of a suspected head injury

from playing. *Id.* ¶ 58. That same year, neurological experts convened in Prague to improve the safety and health of athletes, who suffer concussive injuries in football and other contact sports, based on the latest research. *Id.* ¶ 59. These experts recommended that a player should never be returned to play while displaying any concussion-related symptoms, and coined the phrase, "when in doubt, sit them out." *Id.*

Richardson claims that the NCAA and the SEC were in a superior position when compared to himself and other UF football players to know about these studies, *id.* ¶¶ 33, 100, and that they have known of the harmful effects of concussions and subconcussive impacts for decades, *id.* ¶¶ 61–62. According to him, despite this knowledge, the NCAA actively concealed these facts from student-athletes and the public. *Id.* ¶ 61. For example, while the 1998–99 version of the NCAA Sports Medicine Handbook reported that "[c]oncussion and the resulting potential complications, such as [s]econd-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," it also stated that the NCAA "does not endorse any specific concussion grading scale or return-to-play criteria." *Id.* ¶ 66. Defendants did not change their concussion management and return-to-play protocols until 2010. *Id.* ¶ 63.

Furthermore, Richardson alleges that the concussion management plan Defendants adopted in 2010 was and still is deficient. *Id.* ¶¶ 71, 76. For instance, a concussed student-athlete likely will be unable to make an informed decision about their ability to continue playing. *Id.* ¶ 76. And yet, the 2010 protocols allow a concussed student-athlete to return to play if he or she consents, without having received meaningful examination or treatment. *Id.*

Richardson asserts state common law claims of negligence (Count I), fraudulent concealment (Count II), breach of express contract (Count III), breach of implied contract (Count

IV), breach of express contract as third-party beneficiaries (Count V), and unjust enrichment (Count VI). The SEC has moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. The NCAA has moved to dismiss all but the negligence claim for failure to state a claim.

<u>Analysis</u>

## I.      The SEC's Motion Challenging Jurisdiction

The SEC has moved to dismiss the complaint for lack of personal jurisdiction under Rule 12(b)(2). When a defendant makes such a motion, the plaintiff has the burden of demonstrating personal jurisdiction over the defendant. *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). That burden, in a case where a court rules on the motion to dismiss solely based on the submission of written materials, is to "make out a prima facie case of personal jurisdiction." *Id.* (internal quotation marks omitted); *see Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) ("At a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted."). "We take the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423–24 (7th Cir. 2010).

Generally speaking, "[a] federal district court sitting in diversity must apply the personal jurisdiction rules of the state in which it sits." *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015). But, when a case has been transferred under 28 U.S.C. § 1407 (as this one has), the transferee judge "has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 136 F. Supp. 3d 968, 973 (N.D. Ill. 2015) (quoting *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163,

1165 (J.P.M.L. 1976)). This case was transferred by the Judicial Panel on Multidistrict Litigation to this Court from the Southern District of Indiana. *See* Conditional Transfer Order 8, ECF No. 7. And, under Indiana law, "personal jurisdiction extends to the limits allowed by the Due Process Clause of the Fourteenth Amendment." *See E&A Holdings, LLC v. Leviton Mfg. Co.*, No. 118CV02400SEBMJD, 2018 WL 6659729, at *3 (S.D. Ind. Oct. 24, 2018); Ind. Trial P. Rule 4.4(A).

It is hornbook law that two types of personal jurisdiction exist: general and specific. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414–15 n.8–9 (1984). Richardson contends that this Court can exercise personal jurisdiction over the SEC under either rubric.

First, general jurisdiction exists where the defendant has continuous and systematic general business contacts with the forum. *See id.* at 416. To determine whether the contacts of the defendant are continuous and systematic, courts analyze whether and to what extent the defendant conducts business in the forum state, whether the defendant maintains an office or employees in the state, whether the defendant advertises or solicits business in the forum state, and whether the defendant has a designated agent for service of process in the state. *See id.* "Those contacts must be so extensive as to make it 'fundamentally fair to require [a non-resident defendant] to answer in any Indiana court in any litigation arising out of any transaction or occurrence taking place anywhere in the world.'" *Travelers Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd.*, 304 F. Supp. 2d 1018, 1025 (N.D. Ill. 2004) (quoting *Purdue Research*, 338 F.3d at 787)).

Here, it is undisputed that the SEC has never maintained an office or employees in Indiana. Womack Decl. ¶ 7a. Rather, the SEC always has had a single office in Alabama as its principal place of business. *Id.* In addition, the SEC has not conducted any of its operations in Indiana and

has never had any member institution located in Indiana. *Id.* ¶ 4. The SEC and its employees also do not recruit student-athletes from Indiana, or any other state for that matter, for good reason. *Id.* ¶ 7c. The SEC's member institutions compete with each other to recruit student-athletes, and the SEC cannot favor one member institution over another by involving itself in recruiting. *Id.* Finally, the SEC has never retained a registered agent for service of process in Indiana. *Id.* ¶ 5.

Despite this, Richardson argues that the SEC is subject to general jurisdiction in Indiana because the SEC broadcasts its sports programming into all fifty states, including Indiana, thereby generating millions of dollars of revenue. But the SEC's efforts to broadcast television programming into all fifty states does nothing to prove that its contacts with Indiana are greater than its contacts with other states. *See Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 471 (1st Cir. 1990); *Philpot v. Rural Media Grp.*, Inc., No. 1:14–cv–1985–WTL–MJD, 2015 WL 5837567, at *5 (S.D. Ind. Oct. 7, 2015). *Cf. Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014) ("A corporation that operates in many places can scarcely be deemed at home in all of them.").

Richardson also points out that one of the SEC's member institutions (presumably the University of Kentucky, though he does not say) is situated in a state that shares a media market with Indiana. As a result, Richardson argues, the SEC has a greater broadcasting presence in Indiana than in most other media markets. Without more, however, the mere fact that the University of Kentucky is located in a state that shares a media market with Indiana does not establish that the SEC has continuous and systematic general business contacts with Indiana sufficient for general jurisdiction. Accordingly, the Court concludes that the SEC is not subject to general jurisdiction in Indiana.

Turning to specific jurisdiction, "[s]pecific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed

himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). "[T]he nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue." *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012).

To be subject to specific jurisdiction, a defendant need only have sufficient "minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted). Courts look to the defendant's "conduct and connection with the forum State" to determine if he should "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Richardson, who resides in Georgia, played football for the University of Florida from 1994 to 1996. Compl. ¶¶ 9, 78. According to the SEC, the University of Florida has never played a football game in Indiana. Womack Decl. ¶ 9. Nor has the SEC ever organized or conducted any athletic competitions in Indiana. *Id.* ¶ 8.[4] Prior to 2000, the NCAA did not have any offices in Indiana, and the SEC would have had to direct any communications with the NCAA to its then-headquarters in Kansas. *Id.* ¶ 7b. After the NCAA relocated its headquarters to Indiana in 2000, SEC employees have travelled to Indiana to attend meetings conducted by the NCAA, but none of

---

[4]  Inasmuch as the SEC has organized tournaments, games, and competitions, they have been held in South Carolina, Georgia, Florida, Kentucky, Tennessee, Alabama, Louisiana, Missouri, Arkansas, and Texas. *Id.* n.1.

these meetings related to Richardson or the regulation of football during the time that Richardson played at UF. *Id.*

Nevertheless, Richardson maintains that the SEC is subject to specific jurisdiction in Indiana. In support, he points to certain individuals from SEC member institutions who have either served on NCAA committees or boards or have attended NCAA meetings. For instance, Brady Bramlet, a student at the University of Mississippi and a member of the Student-Athlete Advisory Committee, was a guest-in-attendance at a NCAA meeting on April 12–13, 2017. Pl.'s Ex. K, Meeting Attendees, ECF No. 49-11. Kimberly Patterson Walpert of the University of Georgia served on the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports in 2018. Pl.'s Ex. L, Committee Roster, ECF No. 49-12. Eli Capilouto of the University of Kentucky served as a voting member on the NCAA Board of Governors that oversees association-wide issues in 2018 and 2019. Pl.'s Ex. J, Bd. of Governors Roster, ECF No. 49-10. Finally, Mitch Barnhart of the University of Kentucky served as the SEC's voting delegate regarding NCAA legislative actions taken on April 13 and 14, 2017. Pl.'s Ex. K, Attachment A, NCAA Division I Council Legislative Actions, April 13–14, 2017, ECF No. 49-11; *id.*, Attachment B, NCAA Division I Council Voting Results, April 13–14, 2017.

As an initial matter, it is unclear whether each of these individuals' participation in NCAA committees, boards, or meetings required their physical presence in Indiana. In addition, other than Barnhart, there is no indication that any of these individuals participated in these activities on behalf of the SEC, rather than his or her school. Perhaps, most importantly, Richardson has not explained how their various contacts with Indiana relates in any way to the claims that he has asserted in this case.

As to his contract and quasi-contract claims, Richardson does not argue that the SEC did anything in Indiana that gave rise to these claims. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997) ("[I]n a breach of contract case, it is only the dealings between the parties in regard to the disputed contract that are relevant to minimum contacts analysis.") (internal quotation marks omitted). Nor has he pointed to anything that Bramlet, Patterson, Walpert, Capilouto, or Barnhart did that might be relevant to these claims.

Turning to Richardson's fraudulent concealment claim, where a plaintiff alleges an intentional tort, like fraudulent concealment, 'the inquiry focuses on whether the conduct underlying the claim[] was purposely directed at the forum state.'" *Felland*, 682 F.3d at 674 (quoting *Tamburo*, 601 F.3d at 702). Here, Richardson alleges that the SEC fraudulently concealed the risks caused by concussive and subconcussive hits to football players in order to induce him to play football for UF. Compl. ¶ 111. Had he known what the SEC knew, Richardson alleges, he would not have continued to play after a head injury, would have taken additional precautions after sustaining such an injury, or would have quit football altogether. *Id.* ¶ 114. Richardson also alleges that, until 2010, the SEC knowingly withheld crucial information regarding the life-long consequences that repetitive brain injuries could have upon him. *Id.* ¶ 113. Again, nowhere in these allegations does Richardson assert that the SEC took any actions in Indiana or directed any actions specifically at Indiana—by an authorized representative or otherwise—giving rise to this claim.

The same is true with respect to Richardson's negligence claim against the SEC. Richardson does not identify any actions by the SEC in Indiana or directed at Indiana that can form the basis of this claim. And Richardson does not identify any actions taken by Bramlet, Patterson,

Walpert, Capilouto, or Barnhart that could be relevant to his negligence claim. *See generally* Pl.'s Exs., ECF No. 49.

Accordingly, Richardson has failed to establish general jurisdiction or specific jurisdiction over the SEC, and its motion to dismiss for lack of personal jurisdiction is granted.[5] Furthermore, because Richardson has failed to make a colorable showing of personal jurisdiction, his request for jurisdictional discovery is denied. *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 947 (7th Cir. 2000).

## II.    The NCAA's Motion to Dismiss

For its part, the NCAA has moved to dismiss Richardson's fraudulent concealment, contract, and quasi-contract claims pursuant to Rule 12(b)(6), arguing that he has failed to adequately plead the elements of these claims.

### A.    Choice of Law

As a threshold matter, because this Court sits in diversity, it must address the question of which state's laws apply to Richardson's claims. *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 718 (7th Cir. 2018). In making this determination, as a transferee court presiding over a multidistrict litigation, this Court must apply the choice-of-law rules of the transferor forum. *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 732 (7th Cir. 2010). And, because this case was

---

[5]    Because the SEC has prevailed on its Rule 12(b)(2) motion and jurisdiction is lacking, the Court will not address the SEC's arguments under Rule 12(b)(6). *See Bahalim v. Ferring Pharm., Inc.*, No. 16 C 8335, 2017 WL 118418, at *6 (N.D. Ill. Jan. 12, 2017).

transferred from the Southern District of Indiana, *see* Conditional Transfer Order 8, the choice-of-law rules of Indiana govern this analysis.[6]

Under Indiana law, "a choice of law issue will be resolved only if it appears there is a difference in the laws of the potentially applicable jurisdictions." *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002). Here, the NCAA contends that Indiana or Florida law would apply and that they conflict. The NCAA is correct.

With respect to Richardson's fraudulent concealment claim, Indiana and Florida laws conflict because Florida law imposes a strict twelve-year statute of repose on fraud claims, while Indiana law does not.[7] *See* Fla. Stat. Ann. § 95.031(2)(a); *id.* § 95.11(3). Under Indiana's choice-of-law rules (which, as noted, must be applied here), statutes of repose are substantive in nature. *See, e.g.*, *Hedden v. CBS Corp.*, No. 1:13-CV-01986-TWP, 2015 WL 5775570, at *6 (S.D. Ind. Sept. 30, 2015). And Indiana choice-of-law rules dictate that we must "apply the substantive law of the state where the tort was 'committed.'" *Allen*, 766 N.E.2d at 1164 (quoting *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987)). In turn, "a tort is deemed 'to have been committed in the state where the last event necessary to make an actor liable for the alleged wrong takes place.'" *Id.* (quoting *Hubbard*, 515 N.E.2d at 1073). And "[f]or claims of fraud, the tort is considered to have been committed in the state where the loss occurred." *Powell v. Am. Bank & Tr. Co.*, 640 F. Supp. 1568, 1581 (N.D. Ind. 1986).

---

[6]     By contrast, as to matters involving federal procedure, the transferee court is free to apply the law of its own circuit. *See In re McCormick & Co., Inc.*, 217 F. Supp.3d 124, 140 n.4 (D.D.C. 2016); *see also McMasters v. United States*, 260 F.3d 814, 819 (7th Cir. 2001).

[7]     The NCAA also argues that the laws of these state conflict because it is unclear whether Indiana would recognize fraudulent concealment as an independent cause of action. But this argument lacks merit for the reasons discussed in *Rose v. Nat'l Collegiate Athletic Ass'n*, 346 F. Supp. 3d 1212, 1225 (N.D. Ill. 2018).

Here, Richardson alleges that the NCAA fraudulently concealed from him the risks, both short term and long term, associated with concussive and subconcussive hits, and that, as a result, he continued to play football for UF, even though he would have refused to play after sustaining such hits, if he had been privy to this information. Compl. ¶¶ 78, 81, 114. Because UF has never played a football game in Indiana, see Womack Decl. ¶ 9, and because Richardson does not argue that he has ever lived in Indiana or played football in Indiana, it stands to reason that Richardson's fraudulent inducement claim did not arise in Indiana. On the other hand, a great majority of UF's games and practices took place in Florida, and Richardson does not argue that his loss occurred anywhere other than in Florida. Therefore, the Court concludes that Florida law governs Richardson's fraudulent concealment claim.

The Court also believes that there are material differences between the laws of Florida and Indiana bearing upon Richardson's contract and quasi contract claims, including his unjust enrichment claim. According to Richardson, Indiana law governs, because it has the most significant contacts as to those claims. *See* Pl.'s Resp. at 21, ECF No. 48. However, Richardson cites no legal authority or facts to support this contention and, therefore, has waived this argument. *See United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). In any event, the Court finds that, as between Indiana and Florida, Florida has the greater connection to Richardson's contract and quasi-contract claims, because that is where Richardson agreed to play collegiate football, where he performed his obligation to play football in accordance with NCAA rules, and where he was injured by the NCAA's purported breach. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010) (holding that Indiana choice-of-law rules dictate that the law of the forum with the most intimate contacts to the contract

should govern, including the place of negotiation, formation, performance, subject matter, and domicile and residence of the parties); *W. Smelting & Metals, Inc. v. Slater Steel, Inc.*, 621 F. Supp. 578, 582 (N.D. Ind. 1985) (emphasizing the place of performance where the place of negotiation and contracting is nebulous). The only other potential alternative is Kansas law, where the NCAA's headquarters was located during Richardson's playing days. But neither the NCAA nor Richardson invokes Kansas law. Accordingly, the Court will apply Florida law to the contract and quasi-contract claims.

### B. Fraudulent Concealment (Count II)

Turning to the merits of the NCAA's motion, it first argues that Richardson's fraudulent concealment claim should be dismissed based on Florida's twelve-year statute of repose. The NCAA alternatively argues that Richardson has failed to plead fraudulent concealment with sufficient particularity as required by Rule 9(b).

#### 1. Statute of Repose

Florida's statute of repose provides that a fraud claim "must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered." Fla. Stat. § 95.031(2)(a). "There is no tolling provision for the fraud statute of repose." *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 696 (Fla. 2015). "[S]tatutes of repose have no effect on when a cause of action accrues . . . and, therefore, no effect on a statute of limitations defense." *Cruz v. Am. Sec. Ins. Co.*, No. 6:16-cv-1317-Orl-31TBS, 2016 WL 5791245, at *3 n.3 (M.D. Fla. Oct. 4, 2016).

To comply with the statute of repose, a plaintiff must allege that the defendant engaged in fraudulent conduct within twelve years of the filing of the complaint. *Philip Morris USA Inc. v.*

*Gentile*, 281 So. 3d. 493, 494 n.2 (Fla. Dist. Ct. App. 2019).  Whether a plaintiff relied during the twelve-year repose period is irrelevant.  *Hess*, 175 So. 3d at 698.

Here, Richardson says that the NCAA knowingly withheld from him crucial information regarding the long-term consequences of the repetitive brain injuries he had sustained as a football player at UF until at least 2010.  *See, e.g.,* Compl. ¶¶ 64, 71, 80, 109–10.  When these allegations are taken to be true and all reasonable inference are made in Richardson's favor (as the Court must do at this stage), the allegations in the complaint are sufficient to bring Richardson's fraudulent concealment claim within Florida's twelve-year statute of repose, and the NCAA's motion is denied on this basis.

### 2.    Heightened Pleading Standard for Fraud

Next, the NCAA contends that Richardson has failed to adequately allege a claim for fraudulent concealment as required by Rule 9(b).  Rule 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  In short, Rule 9(b) requires a plaintiff to allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff be alleged in detail."  *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (internal quotation marks omitted).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

Nevertheless, the Seventh Circuit "has recognized that a party may make allegations on information and belief in the fraud context when '(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions.'"  *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018) (quoting *Pirelli*

*Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.*, 631 F.3d 436, 442 (7th Cir. 2011)); *see Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)). That said, "[t]he grounds for the plaintiff's suspicions must make the allegations plausible, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Pirelli Armstrong*, 631 F.3d at 443.

A brief recap of Richardson's fraud allegations is helpful here. The NCAA and its predecessor were created in order to protect college-level football players from head injuries. Compl. ¶ 20. In keeping with that mission, from 1920 to 2010, the NCAA knew of and appreciated the significance of the medical literature that detailed the debilitating short- and long-term effects of repetitive traumatic brain injuries, including CTE, Alzheimer's disease, and other neurodegenerative diseases. *Id.* ¶¶ 45–64, 100, 109. In light of those studies, the NCAA had a duty to issue rules and guidelines to safeguard the safety of student-athletes who suffered concussions and subconcussive impacts. *Id.* ¶¶ 65–69.

Yet, Richardson continues, until at least 2010, the NCAA knowingly failed to promulgate and enforce official rules and safety guidelines addressing concussions. *Id.* ¶¶ 65–71. For instance, the NCAA concealed the dangers of concussions in its annual publication of the Sports Medicine Handbook. *Id.* ¶¶ 26, 65–71. And, when the NCAA finally acknowledged the dangers of concussions in its 1994 Handbook by including Guideline 2o,[8] the NCAA did not enforce internationally accepted concussion guidelines and left concussion management to the discretion of the individual teams. *Id.* ¶¶ 63, 65–70. In the same vein, the 1998 Handbook recognized that

---

[8]     Guideline 2o provided: "A student athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred. In addition, no student-athlete should be allowed to return to athletics activity while symptomatic." *Id.* ¶ 70.

concussion and second-impact syndrome are potentially life-threatening, but it also stated that the NCAA did "not endorse any specific concussion grading scale or return-to-play criteria." *Id.* ¶¶ 66, 68. And, even after Richardson left UF, the NCAA continued its course of fraudulent concealment by failing to inform him that he had been exposed to an increased risk of long-term brain damage. *Id.* ¶¶ 64, 71. In these ways, the complaint says, the NCAA fraudulently concealed from Richardson not only the risks of returning to play after a concussion, but also the lifelong neurodegenerative conditions associated with repetitive concussive and sub-concussive injuries. *Id.* ¶¶ 71, 109–10.

To make matters worse, Richardson adds, the medical literature that discussed these issues were readily accessible to the NCAA, but not to him. *See* Compl. ¶¶ 100, 111–14. And, while he cites to some of the NCAA's Handbooks and other NCAA documents bearing on this issue, *see* Compl. ¶¶ 26, 61–69, they clearly are all uniquely in the possession of the NCAA, as are other facts that may substantiate his claim. Given these allegations, the Court finds that Richardson has pleaded facts sufficient to satisfy the requirements of Rule 9(b), and the NCAA's motion to dismiss the fraudulent concealment claim is denied.

## C. Breach of Express and Implied Contract (Counts III and IV)

The NCAA also argues that Richardson has failed to adequately allege that it breached an express or implied contract. To allege breach of an express contract under Florida law, a plaintiff must allege "(1) a valid contract, (2) a material breach, and (3) damages. A valid contract requires offer and acceptance." *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1341 (S.D. Fla. 2011). Likewise, "Florida courts use breach of contract analysis to evaluate claims of breach of contract implied in fact . . . ." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012).

It is worth noting, however, that "there is no federal pleading requirement that a written contract be appended to a complaint nor is there any requirement that it be directly quoted." *Evan Law Grp. LLC v. Taylor*, No. 09 C 4896, 2010 WL 5135904, at *6 (N.D. Ill. Dec. 9, 2010). Instead, "a party must allege the facts from which the legal conclusion that a contract existed may be drawn-specifically, an offer, acceptance of the offer, and consideration." *C.I. Spataro Napoli, S.A. v. Fashion Concepts, Inc.*, No. 12-80885-CV, 2012 WL 12862817, at *1 (S.D. Fla. Dec. 20, 2012).

In the NCAA's view, Richardson offers only baseless legal conclusions and vague factual allegations to support his express and implied contract claims. But a review of the complaint reveals the error of this argument.

Here, Richardson alleges that, in order to play football for UF, he was required to enter into a written agreement with the NCAA that he would comply with the NCAA's Constitution, bylaws, and regulations. Compl. ¶¶ 118, 122, 129. In exchange, he states, the NCAA agreed to conduct football in a safe manner and require UF to protected the health and safety of its football players. *Id.* ¶¶ 119. Richardson alternatively asserts that, in the absence of an express contract, the NCAA's conduct, as well as the many statements in its Constitution, bylaws, rules and regulations, evinced its assent to enter into an implied agreement with Richardson to safeguard his health if he agreed to play football at UF and follow the NCAA's guidelines. *Id.* ¶ 129. According to Richardson, he fulfilled his obligations under the agreement, *id.* ¶¶ 124, 130, while the NCAA breached its promises to him, *id.* ¶ 121, causing him great suffering and pain, *id.* ¶ 125.

Assuming the truth of these allegations and construing all reasonable inferences in Richardson's favor, the Court concludes that Richardson has pleaded claims for breach of contract and quasi-contract sufficiently to defeat a motion to dismiss under Rule 12(b)(6). The NCAA's motion to dismiss these claims is denied.

#### D. Breach of Express Contract as a Third Party Beneficiary (Count V)

In addition to a claim for breach of contract, Richardson asserts that he was a third-party beneficiary to the contract between the NCAA and UF, and that the NCAA has breached that contract, damaging him. "Under Florida law, to succeed as a third party beneficiary on a breach of contract claim, the plaintiff must prove '(1) existence of a contract; (2) the clear or manifest intent of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach.'" *Gables Ins. Recovery, Inc. v. Blue Cross & Blue Shield of Fla., Inc.*, 813 F.3d 1333, 1338 (11th Cir. 2015) (quoting *Found. Health v. Westside EKG Assocs.*, 944 So.2d 188, 195 (Fla. 2006)). "The third parties do not need to be specifically named in the contract to qualify as intended beneficiaries, as long as the contract refers to a well-defined class of readily identifiable persons that it intends to benefit." *Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1398 (S.D. Fla. 2014) (internal quotation marks omitted).

"If the intent of the contracting parties is not clear from the contract, the Court may consider extrinsic evidence of the parties' intent." *Rebman v. Follett Higher Educ. Grp., Inc.*, 248 F.R.D. 624, 631 (M.D. Fla. 2008). Extrinsic evidence must establish "that the parties to the contract actually and expressly intended to benefit the third party; it is not sufficient to show only that one of the contracting parties unilaterally intended some benefit to the third party." *Morgan Stanley DW Inc. v. Halliday*, 873 So.2d 400, 403 (Fla. Dist. Ct. App. 2004).

The NCAA argues that Richardson has not alleged the existence of a contract between it and UF that recognizes him as a third-party beneficiary or any facts establishing their intent to benefit Richardson when entering into that agreement. In support, the NCAA primarily relies on *Hairston v. Pac-10*, 101 F.3d 1315, 1320 (9th Cir. 1996). But that case is readily distinguishable.

In *Hairston*, University of Washington ("UW") football players sued the NCAA's Pac-10 Conference as third-party beneficiaries to a contract between the Pac-10 and the University of Washington. *Id.* The players alleged that the Pac-10 breached its contractual obligation to provide "quality competitive opportunities" when it banned UW from bowl games as a sanction for UW's violation of NCAA rules. *Id.* The district court dismissed the claim, and Ninth Circuit affirmed, agreeing that the Pac-10's stated goals of realizing certain values such as "academic and athletic achievement of student-athletes," "increased educational opportunities," "quality competitive opportunities," and "amateurism in intercollegiate athletics" were vague and hortatory and insufficient to support the players' claim that the Pac-10 intended to assume a direct contractual obligation to every football player on a Pac-10 team. *Id.*

By contrast, the contractual obligations alleged here are more specific and targeted at the safety and well-being of student-athletics. For instance, Richardson claims that the NCAA and UF entered into an agreement by which the NCAA agreed to enact and implement rules and regulations to protect the safety and well-being of each student-athlete, including Richardson. *See, e.g.,* Compl. ¶¶ 19, 24, 118–19, 135–36. Furthermore, Richardson asserts, the agreement provided that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the [NCAA] shall be applied to an institution when it fails to fulfill this obligation." *Id.* ¶ 23. In addition, the agreement stated that "[e]ach institution shall comply with all applicable rules and regulations of the [NCAA] in the conduct of its intercollegiate athletics programs." *Id.* ¶ 25.

These statements were not merely aspirational, but expressed specific commitments by the NCAA and UF in the regulation of UF's football program to safeguard the mental and physical well-being of its football players. *Id.* ¶¶ 92–94, 117, 138. Moreover, the terms of this agreement,

as alleged in the complaint, show that it was the intent of the NCAA and UF to oversee football operations in a way that would directly benefit UF football players. *See id.* ¶ 138. Accordingly, the NCAA's motion to dismiss Richardson's third-party beneficiary contract claim is denied.

### E. Unjust Enrichment in the Alternative to Breach of Contract (Count VI)

Finally, the NCAA moves to dismiss Richardson's unjust enrichment claim (which he pleads in the alternative to his breach-of-contract claims). For an unjust enrichment claim, Florida law requires that (1) the plaintiff directly confers a benefit upon the defendant, who has knowledge of the benefit; (2) the defendant accepts and retains the conferred benefit; and (3) under the circumstances it would be inequitable for the defendant to retain the benefit without paying for it. *See Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So. 2d 876, 879 (Fla. Dist. Ct. App. 1996). "It is not enough to show that the defendant obtained a benefit and that the plaintiff was in some roundabout way damaged." *Caldwell v. Compass Entm't Grp. LLC*, No. 6:14-cv-1701-Orl-41TBS, 2016 WL 7136181, at *2 (M.D. Fla. Feb. 4, 2016).

The NCAA argues that Richardson has failed to plead the first element of the claim, because he has failed to allege that he directly conferred a benefit upon the NCAA. In support, the NCAA cites *Johnson v. Catamaran Health Solutions, LLC*, 687 F. App'x 825, 827 (11th Cir. 2017). There, the plaintiffs paid premiums to an insurance broker for a disability group policy underwritten by an insurance company. After the policy was cancelled, the plaintiffs sued the insurance company for unjust enrichment. *Id.* The district court dismissed the claim, and the Eleventh Circuit affirmed, holding that, because the plaintiffs had paid premiums directly to the broker, rather than the insurance company, they failed to allege that they conferred a benefit directly on the insurance company as required under Florida law. *Id.*

Here, Richardson claims that he conferred a benefit upon the NCAA by playing football for UF.  Compl. ¶ 78.  Richardson makes this connection by claiming that his participation in UF's football program contributed to the revenues generated by UF from broadcasting rights, merchandise sales, and tickets sales, *id.* ¶¶ 5, 7, 60, 81, 144.  This, in turn, provided revenues for the NCAA vis-à-vis its own broadcasting contracts, merchandising contracts, and ticket sales, at least when it came to UF football games.  *Id.* ¶ 142.  And so, Richardson seeks disgorgement of monies the NCAA allegedly received from these contracts.  *Id.* ¶¶ 144–45.  But this theory suffers from the same flaw that the court identified in *Johnson*—the benefit that Richardson claims to have conferred upon the NCAA is too attenuated from his own actions to state a claim for unjust enrichment under Florida law.  Accordingly, the NCAA's motion to dismiss Count VI is granted, and Richardson's unjust enrichment claim is dismissed without prejudice.

### Conclusion

For the reasons provided above, the SEC's motions to dismiss is granted and the NCAA's motion to dismiss is granted in part and denied in part.  The Court grants the NCAA's motion to dismiss Richardson's unjust enrichment claim (Count VI), which is dismissed without prejudice, and denies the motion to dismiss in all other respects.


**IT IS SO ORDERED.**                                **ENTERED   3/30/20**


_____
**John Z. Lee**
**United States District Judge**

26